IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

STEVEN G. PALANUK,                                         Civ. No. 09-6169-AC

                              Plaintiff,                          FINDINGS AND
                                                          RECOMMENDATION

        v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                              Defendant.

_____

ACOSTA, Magistrate Judge:

     Claimant Steven G. Palanuk ("Claimant") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act ("SSA") and for Supplemental Security

Income ("SSI") disability benefits under Title XVI of the SSA.  *See* 42 U.S.C. §§ 401-433 and

FINDINGS AND RECOMMENDATION          1                              {KPR}

§§ 1381-83f (2010). This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Following a careful review of the record, the court concludes that the decision of the Commissioner should be reversed and remanded for an award of benefits.

## Procedural History

Claimant filed for DIB and SSI benefits on October 13, 2004, alleging a disability onset date of December 15, 1997. The claim was denied initially and on reconsideration. On September 20, 2007, a hearing was held before an Administrative Law Judge ("ALJ"), who issued a decision on October 19, 2007, finding Claimant not disabled. Claimant requested review of this decision on October 30, 2007. The Appeals Council denied this request making the ALJ's decision the Commissioner's final decision. Claimant filed for review of the final decision in this court on June 12, 2009.

## Factual Background

Claimant is a 47 year old high-school graduate. In his disability report, dated October 28, 2004, Claimant reported that he was five feet and eight inches tall and weighed 295 pounds. (Tr. 73.) He stated that problems with his feet limited his ability to work. *Id.* In a report completed on January 11, 2005, entitled "Daily Living Activities: For Homeless Persons," Claimant referred to his foot condition as "gout" and reported that he experiences flare-ups every two to three months which last anywhere from three to eight days. (Tr. 92.) Claimant stated that he typically sleeps "on a friend's couch, at the shelter, [or] under a bridge," and that he has trouble sleeping. (Tr. 92.) He reported that "when [his] gout flares up [he] can't stand, walk or crawl. [His] friends bring [him] buckets to go to the bathroom in and bring [him] food and water." (Tr. 93.) Claimant stated his current weight as 320 pounds. (Tr. 95.) He also reported that he has anxiety "in groups or crowded

places[,]" and is easily offended when he is teased, due to a lifetime of being "teased and bullied." *Id*. Furthermore, Claimant stated that depression and pain make his life difficult and he has a hard time remembering appointments, focusing, following through, and reading. (Tr. 96.)

Claimant also completed a disability report on January 11, 2005. This report states that he suffers from post-traumatic stress disorder, gout, depression, anxiety, obesity, and back pain. (Tr. 107.) The record contains a "Vocational Decision Worksheet," which concluded that Claimant was capable of performing past relevant work. (Tr. 123.) Another report concluded that Claimant's reports of non-exertional limitations were credible and supported by evidence in the record. (Tr. 125.)

Claimant's mother, Cozzy Palanuk ("Ms. Palanuk"), filled out a third-party function report on her son's behalf. Ms. Palanuk stated that she did not spend much time with her son and that she did not know what he did during the course of the day. (Tr. 81.) She reported that when Claimant's feet were bothering him, he was unable to walk and had great difficulty performing basic personal care tasks, like dressing, bathing, and using the toilet. (Tr. 82.) In fact, Ms. Palanuk reported that when Claimant's feet were acting up, he had to use a bag to go to the bathroom and ask another person to take that bag to the trash can. *Id.* She stated that Claimant was capable of shopping for himself and was able to effectively manage his money. (Tr. 84-85.) Ms. Palanuk noted that Claimant uses crutches, a walker, and a wheelchair when he experiences periods of foot pain. (Tr. 87.)

Claimant's medical records reveal the following. Claimant saw Dr. Wendy Callander ("Dr. Callander") on October 27, 1997, and reported pain and popping in his left foot. (Tr. 130.) Dr. Callander wrote that an x-ray of Claimant's foot revealed "mid metatarsal abductus and a flattened

metatarsal arch ... [with] some tiny cortical avulsions of the talus[.]" *Id.* She noted that Claimant was obese and had very flat plantar and metatarsal arches, and a "fallen metatarsal arch on the left foot[.]" (Tr. 131.) Medical records from Lane County Jail, dated June 23, 2004, state that Claimant reported suffering from gout, but that this condition had not been diagnosed by a doctor. (Tr. 144.) On August 30, 2006, Claimant was seen at the White Bird Medical Clinic, with cellulitis[1] of the right foot. A treating physician, Dr. Newhall, assessed Claimant's condition: "Gouty arthritis vs. cellulitis." (Tr. 225.) On November 1, 2006, Claimant complained of four days of "gouty pain." (Tr. 223.) On April 3, 2007, Claimant complained of painful gout and Dr. Newhall assessed it as "Gout." (Tr. 222.) However, Dr. Newhall changed his assessment of Claimant's condition on July 17, 2007, writing: "arthritis . . . this does not look like gout." (Tr. 221.) On October 13, 2007, Claimant saw Dr. William Moshofsky, who reported popping, tenderness, and likely tendinitis in Claimant's foot that was not helped by taking ibuprofen. (Tr. 132.)

Claimant was evaluated by Dr. Robert Henry ("Dr. Henry"), a psychologist, on December 27, 2004, in connection with his application for benefits. Dr. Henry noted that Claimant suffered from a substance abuse disorder, specifically alcohol abuse. (Tr. 165.) He also noted that, though Claimant's foot problems may be caused by gout, there were also bone irregularities present in Claimant's foot. (Tr. 169.) On February 23, 2005, Claimant was evaluated by Dr. David Northway ("Dr. Northway"), a psychologist. (Tr. 174.) Dr. Northway considered Claimant's presentation credible, characterizing it as "honest and straightforward[.]" *Id.* Claimant reported to Dr. Northway that he had experienced physical and psychological abuse as a child; had an extensive drug history and, while no longer using methamphetamine, was currently using alcohol and marijuana; and had

---

[1] Cellulitis is a bacterial infection of the skin.

difficulty sleeping. *Id*.

Dr. Northway observed that Claimant displayed some psychomotor retardation; reported hearing voices and suicidal ideation; had intelligence in the low average to borderline range; was only marginally capable of basic activities of daily living; and noted that his grooming and hygiene were poor. (Tr. 176.) Dr. Northway also observed Claimant's significant cognitive limitations, including difficulty learning and tendency to become distracted, and his significant impairment in social functioning. Dr. Northway noted that Claimant had never received psychotropic medications; had alcohol and drug problems; had a global assessment of functioning score of 45; and that Claimant's weight was likely an obstacle to successful employment. (Tr. 177-78.)

Claimant was evaluated by Brent Kimberly ("Kimberly"), an osteopathic physician, at MDSI Physician Services on February 26, 2005. (Tr. 179.) Regarding Claimant's foot pain, Kimberly noted that Claimant believed he had been diagnosed with gout and had been on the drug Ansaid for a time which provided him some relief. *Id*. Claimant reported that his pain had increased since gaining sixty to seventy pounds and reported that he experienced flare-ups approximately once a month for one to two weeks at a time. *Id.* According to Claimant, he could not walk well but could ride a bike. *Id.* Kimberly characterized Claimant as morbidly obese and opined that the obesity contributed to his pain issues. Even so, Kimberly observed that Claimant "ha[d] surprisingly good mobility despite his obesity." (Tr. 180.) Kimberly gave a functional assessment stating that Claimant was capable of standing for six hours in an eight hour day; carrying twenty-five pounds frequently and fifty pounds occasionally; and performing some bending and crawling. (Tr. 181.)

Claimant underwent a psychiatric review by Dr. Karen Bates-Smith ("Dr. Bates-Smith") on March 18, 2005. (Tr. 182.) Dr. Bates-Smith concluded that Claimant suffered from the following

listed impairments: 12.02 Organic Mental Disorders; 12.06 Anxiety-Related Disorders; 12.08 Personality Disorders; and 12.09 Substance Addiction Disorders. *Id*. Dr. Bates-Smith characterized the degree of Claimant's functional limitations: activities of daily living, mild; social functioning, moderate; maintaining concentration, persistence, or pace, moderate; and decompensation, none. (Tr. 192.) She noted that Claimant had many problems, but that those problems were not extensively corroborated and that Claimant had not received much treatment.

Claimant's physical and mental Residual Functional Capacities ("RFC") were assessed separately. The physical assessment was completed by Dr. Martin Lahr and essentially tracks the conclusions reached by Kimberley, noting specifically that Claimant is surprisingly mobile despite his obesity. (Tr. 196-203.) The mental assessment, performed by Dr. Bates-Smith, characterized Claimant as moderately limited in that Claimant could understand, remember, and carry out detailed instructions; maintain attention for extended periods of time; set goals; and make individual plans. (Tr. 204-5.) Claimant was characterized as markedly limited in interacting appropriately with the general public. (Tr. 205.) Dr. Bates-Smith concluded that Claimant was capable of carrying out simple instructions, of one or two steps, but would require supervision for more complex tasks. She further concluded that Claimant could persist in these simple tasks for two hours; could work with others, but not the general public; and would perform better under a supervisor who gave constructive criticism. (Tr. 206.)

At the hearing, the ALJ heard testimony from Claimant and a vocational expert ("the VE"). Claimant testified that he could not work due to depression, which he has had since 1987. (Tr. 272, 275.) He stated that he suffered from gout approximately two to three times a month, for approximately four to five days at a time, and that he was taking Indocin to treat gout which was

helpful, though it caused him to have embarrassing accidents. *Id*. Claimant testified that he experienced weekly panic attacks. (Tr. 276.) As for mobility, Claimant stated that on days that he suffers from gout, he cannot walk at all, while on his good days, he can walk up to ten blocks at time; he can sit for fifteen to twenty minutes and stand for forty-five minutes at a time; he gets along with people unless they are being mean to him, doesn't like crowds, and is frustrated when people tease him; he does not sleep well and has to get up to use the restroom a lot; and he has gained weight in the last six months and is up to 323 pounds. (Tr. 273, 277-78, 280, 283, 285.)

The VE testified that Claimant cannot perform past relevant work. (Tr. 287.) However, under the hypothetical given by the ALJ, the VE stated that the hypothetical individual would be capable of performing the duties of a small products assembler, an electronics worker, and a semiconductor wafer breaker. (Tr. 288.) These jobs are available in the national and local economies. *Id.* However, the VE testified, if the hypothetical individual could not stand or walk for two hours out of an eight-hour day, that individual would not be employable. (Tr. 289.) Similarly, if the hypothetical individual missed work three or four days every month, that individual would also not be employable. (Tr. 289-90.)

### *Summary of the ALJ's Findings*

The ALJ engaged in the five-step "sequential evaluation" process when he evaluated Claimant's disability, as required. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

### I.    Steps One and Two

At Step One, the ALJ concluded that Claimant had not engaged in any substantial gainful activity since the onset of his alleged disability. (Tr. 18.) At Step Two, the ALJ determined that

Claimant had the following severe impairments:  borderline intellectual functioning, obesity, gout, anxiety disorder, personality disorder with schizotypal and antisocial features, and polysubstance abuse.  (Tr. 18.)  The ALJ's specific findings as to each impairment are detailed below.

        a.    *Borderline Intellectual Functioning*

Claimant has complained of being "slow" and "reported having been enrolled in some special education courses in school[.]"  (Tr. 19.)  Dr. Northway observed that Claimant "demonstrated borderline intellectual functioning, poor judgment, marginal abilities attending to activities of daily living, and problems with abstract thinking, concentration, vigilance, verbal memory, and comprehension."  *Id.*  As a result, Claimant has difficulties assimilating new information, maintaining focus, and avoiding conflict with others.  *Id.*  Furthermore, Dr. Northway assigned Claimant a GAF score of 45.  (Tr. 20.)

        b.    *Obesity*

The ALJ noted that "the medical evidence supports the physical diagnos[is] of . . . obesity."  (Tr. 22.)  Based on record evidence, the ALJ observed that Claimant "is five feet, eight inches tall, and weighs between 310 and 320 pounds, which is medically defined as morbid obesity . . . ."  (Tr. 19.)

        c.    *Gout*

The ALJ recognized that Claimant has "reported he has gout that causes his feet to swell and be painful, resulting in difficulty standing and walking."  (Tr. 18.)  As a result, Claimant experienced flare-ups of gout approximately three times a year, for a period of three to eight days, though the frequency has been increasing recently.  (Tr. 18.)  The ALJ stated that "alcohol consumption is contraindicated for gout, and [took] judicial notice that alcohol will bring on an episode of flared

symptoms." (Tr. 18-19.) Furthermore, the ALJ stated that morbid obesity tends to exacerbate symptoms of gout. (Tr. 19.) Claimant's mother, Ms. Palanuk, testified that "[C]laimant experiences pain in his feet," but did not provide specific information to further aid the ALJ in this determination. (Tr. 19.)

> d.    *Anxiety and Personality Disorders*

Claimant reported experiencing post-traumatic stress disorder, depression with suicidal ideation, and anxiety. (Tr. 18.) As a result of depression and anxiety, Claimant experiences confusion, feels overwhelmed, "and is unable to follow through with tasks[.]" (Tr. 18.) He also has a history of childhood abuse and has difficulties getting along with others and in crowds. *Id.* The ALJ considered Claimant credible as to his mental health problems. (Tr. 20.) The ALJ noted, however, that the record does not contain mental health treatment records indicating symptoms or treatment, and that Claimant has never been referred for a psychiatric evaluation. As with Claimant's other impairments, the ALJ concluded that Claimant's mental impairments are exacerbated by his substance abuse and would be diminished were Claimant to stop abusing substances.

> e.    *Substance Abuse*

Regarding Claimant's substance abuse, the ALJ determined that it exacerbated Claimant's other impairments. The ALJ wrote: "the evidence shows that the claimant's mental symptoms are aggravated by his continued substance abuse, and cause increased difficulty interacting with others without engaging in conflict, exercising adequate judgment, and problems maintaining concentration and focus." *Id.* Similarly, the ALJ noted that Claimant's intellectual functioning was hindered by "continued alcohol and cannibis abuse," which also contributed to the low GAF score of 45 he

FINDINGS AND RECOMMENDATION        9                                {KPR}

received from Dr. Northway.  *Id.*

## II.    Step Three

At Step Three, the ALJ concluded that "[C]laimant's impairments, including the substance use disorders, meet listings 12.06, 12.08, and 12.09."  (Tr. 19.)   The ALJ noted that Claimant satisfies the requirements set forth in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1. Specifically, Claimant satisfies the requirements of "paragraph A," i.e., the requirement for medically documented findings of the disorder, as well as the requirements of "paragraph B," i.e., that Claimant suffers marked limitations in social functioning and maintaining concentration, persistence, and pace.  (Tr. 20.)

The ALJ also determined, however, that Claimant's substance abuse is a factor material to his disability and exacerbates both his mental condition and those symptoms related to gout.  *Id.* Although the ALJ recognized that Claimant is currently unable to work, the ALJ concluded that if Claimant stopped abusing substances, he "would not have an impairment or combination of impairments that meets or medically equals," an impairment listed in the regulations.  (Tr. 21.)  The ALJ went on to evaluate Claimant's RFC were Claimant were to stop abusing substances.

## III.    Claimant's RFC

The ALJ determined that, were Claimant to stop abusing substances, he would be capable of the following:  lifting and carrying twenty pounds occasionally; lifting and carrying ten pounds frequently; sitting for six hours in an eight-hour workday; standing or walking for two hours in an eight-hour workday; and occasionally climbing ramps or stairs, kneeling, crouching, or crawling. The ALJ found Claimant not capable of climbing ladders, ropes or scaffolds and restricted him to "performing simple, routine tasks and instructions, and occasional contact with co-workers[.]"  (Tr.

21.)  The RFC restricted Claimant from contact with the public.  *Id.*

The ALJ based this RFC on several considerations.  First, Claimant's medical limitations, gout and obesity, were accounted for in limiting Claimant to light duty work and providing for "no prolonged standing or walking during episodes of gout flares."  (Tr. 22.)  Second, the record does not contain evidence of Claimant's mental functioning when he is not using substances, so the ALJ looked to notes from the rehabilitation program Claimant attended in 1999, during which time he "sustained sobriety" and "demonstrated improved functioning in all areas."  *Id.*  Third, time spent at shelters and soup kitchens demonstrated to the ALJ that Claimant could "adequately relate with others on at least a minimal basis." (Tr. 23.)  Fourth, Claimant has not been referred for a psychiatric evaluation by his treating sources, suggesting that he is not significantly mentally impaired.  *Id.*  For those reasons, the ALJ concluded that if Claimant stopped abusing substances he could reasonably be expected to perform consistent with the stated RFC.

## IV.    Step Four

At Step Four, the ALJ concluded that even if Claimant "stopped the substance abuse, [he] would be unable to perform past relevant work[.]"  (Tr. 23.)  The ALJ based this conclusion on Claimant's RFC and noted his agreement with the VE on this point.

## V.    Step Five

At Step Five, the ALJ concluded that Claimant was capable of performing other work that exists in substantial numbers in the national economy.  The ALJ cited the VE's testimony that a hypothetical individual with Claimant's limitations could perform the jobs of small products assembler, electronics worker, and semi-conductor wafer breaker.  Each job is classified as unskilled and light or sedentary exertional work activity.  Therefore, the ALJ wrote, if Claimant stopped using

substances, "he would be capable of making a successful adjustment to work that exists in significant numbers in the national economy."  (Tr. 24.)

*Discussion*

Claimant argues that the ALJ erred on four grounds:  (1) the ALJ improperly rejected the findings of Dr. Newhall, a treating physician; (2) the ALJ failed to properly consider Claimant's testimony; (3) the ALJ improperly discounted lay witness testimony; and (4) the ALJ erred at Step Five in failing to include all of Claimant's limitations in the hypothetical presented to the VE.  The court will address each objection in turn.

I.      Dr. Newhall's Findings

Claimant argues that the findings of Dr. Newhall were improperly interpreted by the ALJ. In particular, Claimant cites evidence tending to show that Dr. Newhall did not diagnose Claimant as having gout, but rather diagnosed Claimant with arthritis.  This diagnosis, Claimant alleges, is consistent with the findings of other treating and examining physicians on the record, namely, Drs. Callander, Cavan, and Moshofsky.  Furthermore, the ALJ improperly "diagnosed" Claimant with "gouty arthritis" as well as improperly took judicial notice that the use of alcohol exacerbates symptoms of gout.  Accordingly, his conclusion that Claimant would be able to perform the full range of light work if he stopped using alcohol was not supported by the record.  In conclusion, Claimant argues that in failing to give clear and convincing reasons to reject the findings of Dr. Newhall, the ALJ erred.

The Commissioner responds that Dr. Newhall did in fact diagnose Claimant with gout, although he also characterized his foot problems as arthritis.  According to the Commissioner, however, the ALJ's treatment of this diagnosis does not amount to the rejection of Dr. Newhall's

findings. Furthermore, evidence that Claimant suffers from a foot deformity does not undermine the ALJ's determination either, because at least one doctor read Claimant's x-ray as negative for abnormalities. Therefore, the ALJ's interpretation was at least a reasonable interpretation based on the record evidence. Finally, because the ALJ's interpretation is not inconsistent with the underlying record evidence, the ALJ did not err.

The record reveals that Dr. Newhall saw Claimant at White Bird Medical Clinic between August 2006 and July 2007. On August 30, 2006, Dr. Newhall assessed Claimant's condition as "[g]outy arthritis" or "cellulitis" and prescribed Indocin[2]. (Tr. 225.) At this point, Dr. Newhall did not diagnose Claimant with gout. On April 3, 2007, Dr. Newhall again saw Claimant and assessed his condition as "[g]out." (Tr. 222.) He continued to prescribe Indocin to Claimant. On July 17, 2007, Dr. Newhall saw Claimant. In his assessment, he stated that Claimant suffered from arthritis and wrote: "this does not look like gout." (Tr. 221.) He continued to prescribe Indocin to Claimant.

Years earlier, on October 29, 1997, Claimant saw Dr. Callander and complained of foot pain and popping. (Tr. 130.) Dr. Callander reviewed an x-ray taken by Dr. Moshofsky. Dr. Callander found that, contrary to Dr. Moshofsky's finding that the x-ray was normal, the x-ray showed "mid

---

[2] Indocin is the brand name for the generic drug Indomethacin. It is "used to relieve the inflammation, swelling, stiffness, and joint pain asssociated with moderate or severe rheumatoid arthritis . . . ." PDR Health http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName= Ind1209.html&contentName=Indocin&contentId=2 (last visited April 12, 2010). It is also used to treat "acute gouty arthritis, and other kinds of pain." *Id*.

metatarsal adductus[3] and a flattened metatarsal arch[,]" and "some tiny cortical avulsions[4] of the talus[5][.]" (Tr. 130.)  No mention of gout is made by Dr. Callander.  These findings are corroborated by those of Dr. Cavan, dated October 13, 1997.  Dr. Cavan wrote:  "The patient has developed mid metatarsus adductus and the arch may be a little flat.  There are tiny bony denisities off the top of the distal non-articular talus on the lateral film which represent tiny cortical avulsions of indeterminate age."  (Tr. 134.)

In general, the opinion of a treating physician is entitled to controlling weight if well supported and consistent with underlying evidence.  "[A]n ALJ may not reject treating physicians' opinions unless he 'makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'"  *Smolen v. Chater*, 80 F.3d 1273, 1285 (1996) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).  Where the opinion is uncontroverted, the ALJ must give clear and convincing reasons to reject the opinion of the treating physician.  *Id.*

To the extent that the ALJ's disability finding hinges on whether Claimant suffers from gout, the actual diagnosis has important ramifications for Claimant's disability claim.  Here, Claimant is correct that the ALJ did not specifically address the varying diagnoses as to the cause of Claimant's foot pain.  The ALJ failed to make specific findings as to why Dr. Newhall's opinion–that Claimant did not suffer from gout–should be rejected.  Furthermore, the ALJ failed to support or explain his

---

[3] "Metatarsus adductus is a foot deformity.  The bones in the middle of the foot bend in toward the body." http://www.nlm.nih.gov/medlineplus/ency/article/001601.htm (a source provided by the U.S. National Library of Medicine and the National Institutes of Health) (last visited April 12, 2010).

[4] Cortical avulsions are instances where the cortex of the bone has torn away from the bone. *See* MedicineNet.com.

[5] A talus is a bone in the foot.  *See id.*

FINDINGS AND RECOMMENDATION     14     {KPR}

conclusion that Claimant's alcohol use impacted his gout or foot pain such that abstaining from alcohol use would enable Claimant to perform a full range of light duty work. Based on the whole of the record evidence, the bulk of which tends to show that Claimant is severely disabled by episodes of foot pain, the court concludes that the ALJ's analysis was in error.

II.     Claimant's Testimony

Claimant argues that the ALJ erred when he found him selectively credible, lending credence to his testimony regarding his mental limitations and rejecting testimony regarding his physical limitations. Specifically, Claimant objects to the ALJ's rejection of his testimony regarding the severity of his foot pain and the ALJ's reliance on his own observation that use of alcohol increases symptoms of gout. Claimant further alleges that the ALJ failed to account for the combination of Claimant's impairments.

The Commissioner responds that the ALJ did not accept Claimant's testimony for specific and legitimate reasons. First, Claimant's testimony regarding the frequency of his foot pain episodes was inconsistent with representations in his application, where he reported experiencing episodes of gout approximately every two or three months, and a treatment note which stated that Claimant experienced flare-ups approximately every three or four months. Second, Claimant's testimony about the severity of his impairments was undermined by a treatment note prescribing one week of light duty work during an episode of foot pain. The Commissioner maintains that this was at odds with Claimant's testimony that he was unable to walk at all during his bouts of foot pain. Accordingly, the Commissioner contends, the ALJ properly rejected Claimant's subjective complaints.

"Once a claimant produces objective medical evidence of an underlying impairment, an

FINDINGS AND RECOMMENDATION          15                          {KPR}

[ALJ] may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)) (internal quotation marks omitted).  If the ALJ finds the subjective complaints less than credible, the ALJ must make specific findings that support that conclusion.  "[T]he findings 'must be sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit [the] claimant's testimony." *Id.* at 856-57 (quoting *Bunnell*, 947 F.2d at 345).  In the absence of evidence that the claimant is malingering, the ALJ must give "clear and convincing reasons for rejecting the claimant's testimony regarding the severity of symptoms." *Id.* at 857 (citing *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1988)).

In addressing Claimant's credibility as to his physical limitations, the ALJ acknowledged that "the medical evidence supports the physical diagnoses of gout and obesity."  (Tr. 22.)  The ALJ "note[d] that treatment notes reflect limitation to light duty and no prolonged standing or walking during episodes of gout flares." *Id*.  Regarding Claimant's problems with his feet, the ALJ stated that objective evidence established that Claimant suffered from flare-ups approximately three times a year.  The ALJ also stated that "recent treatment records see[m] to indicate an increased frequency of the claimant's symptoms of gout . . . ."  (Tr. 18.)  The ALJ attributed this increase to Claimant's obesity and his alcohol abuse.

In the section discussing whether Claimant would still be disabled if he stopped using substances, the ALJ wrote:

> If the claimant stopped the substance use, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity,

persistence, and limiting effects of these symptoms are not entirely credible.

(Tr. 23.)  This statement appears to conflate credibility analysis with the materiality analysis associated with substance abuse.  Essentially, the ALJ is saying that were Claimant to stop using substances, his symptoms would become less severe.  However, the ALJ also seems to suggest that this fact renders Claimant's current symptom report unreliable.  The court disagrees with the latter suggestion and reads the ALJ's statement to mean the former, that alcohol and marijuana use contribute to Claimant's impairments such that discontinuing use of those substances would render Claimant able to work.  And, in reviewing the opinion as a whole, the ALJ does not explicitly indicate a belief that Claimant's testimony is not credible as to his physical limitations.

The Commissioner argues that the ALJ rejected Claimant's testimony regarding the frequency of his foot pain episodes.  This position, however, is not supported by the ALJ's opinion.  The ALJ did reference the treatment note stating the restriction to "light duty."  (Tr. 22.)  The ALJ also referenced the treatment note that stated the frequency of Claimant's flare-ups as "occurring approximately three times per year."  (Tr. 18.)  Even so, the ALJ went on to say that "recent treatment records see[m] to indicate an increased frequency of the claimant's symptoms of gout . . . ."  *Id.*  Again, it is not that the ALJ explicitly declared Claimant's testimony not credible, it is that the ALJ concluded that Claimant's foot pain was exacerbated by his alcohol use.  The ALJ did not address Claimant's testimony about the frequency or intensity of his pain, nor did he give specific reasons for rejecting the testimony.

The ALJ's written opinion does not explicitly reject Claimant's testimony based on a negative credibility determination.  Even so, the ALJ's analysis contradicts Claimant's testimony as to the physical limitations caused by his impairments.  In failing to explicitly reject Claimant's

testimony, while at the same time making findings contrary to that testimony, the ALJ, in effect, rejected Claimant's testimony as not credible. In doing so, the ALJ failed to make the showing necessary to lawfully reject Claimant's testimony and, thus, the ALJ erred.

III.    Lay Witness Testimony

Claimant argues that the ALJ improperly rejected the testimony of Claimant's mother, Ms. Palanuk. Claimant cites *Dodrill v. Shalala*, 12 F.3d 915 (9th Cir. 1993) for the proposition that the testimony of a lay witness who sees the claimant on a less-than-daily basis is entitled to some weight:

> An eyewitness can often tell whether someone is suffering or merely malingering. While this is particularly true of witnesses who view the claimant on a daily basis, the testimony of those who see the claimant less often still carries some weight. If the ALJ wishes to discount the testimony of the lay witnesses, he must give reasons that are germane to each witness.

*Id.* at 919. Claimant maintains that, because the ALJ did not give a single germane reason to reject this testimony, the ALJ erred in doing so.

The Commissioner responds that the ALJ's observation that Ms. Palanuk saw her son only infrequently adequately justified rejecting her testimony. Furthermore, the Commissioner argues that the testimony was not inconsistent with the ALJ's findings and, thus, the ALJ's treatment of the testimony is immaterial.

The court agrees that the ALJ did not provide a sufficient basis upon which to reject the testimony of Claimant's mother. Although her testimony reveals that she sees Claimant infrequently, this does not render her testimony without value, even if it diminishes its relative weight. Accordingly, the ALJ again erred and the court must consider Ms. Palanuk's testimony in its disability determination.

IV.    Residual Functional Capacity

Claimant argues that the ALJ erred in determining his RFC, first, because the record reveals that Claimant will miss at least two days of work each month[6] and, second, because it relies on the ALJ's erroneous analysis of Claimant's foot problems.  The Commissioner maintains that the ALJ's RFC was appropriately supported by record evidence.

The court concludes that having erred in rejecting the testimony of Claimant and his mother, as well as rejecting the opinion of a treating physician as to the source of Claimant's foot pain, the ALJ's RFC finding was not properly supported by record evidence and was thus in error.

V.    Remand

Claimant requests that the court remand this decision for an award of benefits.  "The decision whether to remand a case for additional evidence, or simply to award benefits is within the discretion of the court."  *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  In *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004), the Ninth Circuit set forth the framework for determining whether a remand for hearing or a remand for benefits is appropriate:

> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful.  Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits.

*Id*. at 594 (citations and emphasis omitted).  Evidence rejected by the ALJ should be credited and remand for benefits granted where:  "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited."  *Id.* (citing *Harman v. Apfel*, 211

---

[6] In fact, the record reveals that Claimant will miss at least four days at a time, twice a month. (Tr. 272.)

F.3d 1172, 1178 (9th Cir. 2000).

This case should be remanded for an award of benefits. First, the court sees no benefit to be gained from enhancement of the record. Treatment notes taken as early as 1997 and as recently as 2007 indicate that Claimant suffers from minor foot deformities. The most recent diagnosis of a treating physician is that of Dr. Newhall who concluded that Claimant did not suffer from gout but rather from arthritis. Claimant's subjective symptom testimony was not discredited and his marked weight gain provides objectively measurable support for more frequent episodes of foot pain.

Second, the ALJ rejected the testimony of both Claimant and Ms. Palanuk without giving legally sufficient reasons. The ALJ also made findings that were unsupported by the record or any other proffered basis. As a result, the court must credit the evidence rejected by the ALJ and, having done so, finds Claimant disabled.

Third, the court disagrees with the ALJ's conclusion that Claimant's substance abuse is material to his disability. As stated above, the ALJ failed to adequately support his assertion that alcohol use exacerbated symptoms of gout. Furthermore, by improperly discounting the findings of Dr. Newhall, the ALJ improperly credited by the diagnosis of gout and ignored other evidence regarding foot pain. After crediting the conclusions of Dr. Newhall and the testimony of Claimant and his mother, it is clear that Claimant's physical disability alone renders him unable to work and he is, thus, disabled. The record evidence that Claimant's drug and alcohol use contributes to his disability is insufficient to overcome the evidence that he is nonetheless disabled. In fact, the record shows that Claimant's physical impairments are profoundly limiting and are increasing in severity. In a similar case, *Clark v. Apfel*, Civ. No. 98-1394-TC, 2000 U.S. Dist. LEXIS 15812, at *9 (D. Or. Mar. 27, 2000), the ALJ denied benefits where the claimant was disabled by physical and mental

ailments, but substance abuse was found to be a material factor. The court referred to an SSA memorandum which stated that where the impairments caused by mental ailments and substance abuse are not separable, it is appropriate to find that the substance use is not material. In this case, the ALJ concluded that substance abuse exacerbated Claimant's mental condition, but made no additional findings as to how it affected specific impairments. This, combined with the ALJ's failure to consider competent testimony and medical evidence, undermines the ALJ's materiality finding.

The court in *Clark*, in finding that the claimant's substance abuse was not material, concluded that development of the record was unwarranted, in part, because the Commissioner "had the opportunity to remand the matter to remedy any defect and/or further develop the record when plaintiff appealed to the Appeals Council." *Clark v. Apfel*, Civ. No. 98-1394-TC, 2000 U.S. Dist. LEXIS 15812, at *9 (D. Or. Mar. 27, 2000). And where, as here, "there is substantial evidence in the record, when viewed as a whole, to establish that plaintiff is disabled," a remand for reconsideration is not appropriate. *Id.* at *9-10. Accordingly, this matter should be remanded for an award of benefits.

*Conclusion*

For the reasons stated, the decision of the Commissioner denying Claimant's application should be reversed and remanded for an award of benefits.

*Scheduling Order*

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due June 25, 2010. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy

of the objections.  When the response is due or filed, whichever date is earlier, the Findings and

Recommendation will go under advisement.

DATED this 11th day of June, 2010.

_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge